### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **In re:** | Case No.  23-20051-DRD |
| **Noble Health Real Estate LLC,** | Chapter 11 |
| **Debtor.** | |

## <u>DEBTOR'S DISCLOSURE STATEMENT</u>

Noble Health Real Estate LLC (Debtor) has prepared this Disclosure Statement (the Disclosure Statement) in connection with the solicitation of acceptances of the Debtor's Plan of Reorganization dated August 01, 2023 (the Plan) filed in the Debtor's bankruptcy reorganization case (the Reorganization Case) under Chapter 11, Title 11, United States Code (the Bankruptcy Code), pending before the United States Bankruptcy Court for the Western District of Missouri, Western Division (the Bankruptcy Court). After a noticed hearing and by order entered on _____ 2023, the Bankruptcy Court approved the Disclosure Statement as containing information of a kind, and in sufficient detail as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of holders of claims of the Classes being solicited to make an informed judgment whether to vote to accept or reject the Plan. This Disclosure Statement is the only document authorized by the Court to be used in connection with the solicitation of votes accepting or rejecting the Plan.

The Plan reflects the Debtor's determined effort to maintain the economic integrity of its businesses and promote the greatest value for the benefit of their creditors. Debtor believes that creditors will receive more value under the Plan than they would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code and that the Plan offers prospects for the highest and best recovery to creditors that can be obtained.

Your vote on the Plan is important. Confirmation of the Plan requires acceptance by each of the voting classes. Pursuant to § 1126 of the Bankruptcy Code, in order for the Plan to be accepted by a voting class, creditors holding at least two-thirds in dollar amount and more than one-half in number of claims allowed for voting purposes in such Class and who actually vote to accept or reject the Plan, must vote in favor of the Plan.

**THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE THEREON BUT IS INTENDED TO AID AND SUPPLEMENT SUCH REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS A SUMMARY ONLY. HOLDERS OF CLAIMS ARE CAUTIONED TO REVIEW THE PLAN ITSELF AND ANY RELATED AGREEMENTS OR TRANSACTIONS FOR A FULL UNDERSTANDING OF ITS PROVISIONS. THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN. THE TERMS OF THE PLAN AND ANY RELATED AGREEMENTS ARE CONTROLLING IF ANY INCONSISTENCY EXISTS BETWEEN THEM AND THIS DISCLOSURE STATEMENT.**

The following is a list of each of the exhibits accompanying this Disclosure Statement:

**EXHIBIT A** – The Reorganization Plan

**EXHIBIT B** – Real Property

**EXHIBIT C** – Liquidation Analysis

**EXHIBIT D** – Pre-Petition Financials

**EXHIBIT E** – Monthly Operating Reports

**EXHIBIT F** – Financial Projections

**EXHIBIT G** – Financial Returns

This Disclosure Statement, the Plan and all exhibits remain subject to modification and amendment in their entirety. All financial information provided herein constitutes the best information available to the Debtor as of the date of the filing of this Disclosure Statement and remains subject to revision.

Capitalized terms used in the Disclosure Statement that are not specifically defined herein have the meanings set forth in the Plan. All exhibits to the Disclosure Statement are incorporated by reference into and made a part of the Disclosure Statement.

**YOU SHOULD READ THE DISCLOSURE STATEMENT AND ITS EXHIBITS IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. NO STATEMENTS NOR INFORMATION CONCERNING THE DEBTOR OR ANY OTHER ENTITY DESCRIBED IN THE DISCLOSURE STATEMENT OR THE PLAN, PARTICULARLY AS TO THEIR FUTURE BUSINESS OPERATIONS, PROFITS, FINANCIAL CONDITIONS, ASSETS, LIABILITIES, OR THE DEBT SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT.**

The financial information set forth in the Disclosure Statement has not been audited. The Debtor is unable to represent and warrant that the information set forth in the Disclosure Statement is without any inaccuracy. To the extent practicable, however, the information has been prepared from the Debtor's financial books and records and great effort has been made to ensure that all such information is fairly presented.

## I.   PROCEDURAL INFORMATION

### A.  Voting.

Under § 1126 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3018(a), only creditors whose claims are deemed allowed pursuant to § 502 of the Bankruptcy Code or have been allowed by an Order of the Bankruptcy Court are entitled to vote on the Plan. A holder of an unimpaired claim is deemed to have accepted the Plan.

Except as otherwise provided in the Disclosure Order, ballots are being sent with the Plan and Disclosure Statement to the known holders of all claims against the Debtor as of the Commencement Date, including those that have been or will be objected to by the Debtor. The holders of Claims and interests that have been objected to by the Debtor are not entitled to vote on

the Plan unless otherwise ordered by the Bankruptcy Court in accordance with Federal Rule of

Bankruptcy Procedure 3018(a), which provides, in pertinent part, that: "Notwithstanding objection

to a claim or interest, the Court, after notice and hearing, may temporarily allow the claim or

interest in an amount which the Court deems proper for the purpose of accepting or rejecting a

Plan." Additional rules governing the voting process are set forth in the Disclosure Order that

accompanies the Disclosure Statement.

All pleadings and other documents referred to in the Disclosure Statement as being on file

with the Bankruptcy Court are available for inspection and review during normal business hours

at the office of the Clerk of the Bankruptcy Court, 400 E. Ninth St., Kansas City, Missouri 64106.

In addition, such pleadings and documents may be viewed online at https://ecf.mowb.uscourts.gov

using PACER access.

ANY CHANGES TO THESE DOCUMENTS WILL BE DESCRIBED AT THE
HEARING ON THE CONFIRMATION OF THE PLAN.

After carefully reviewing the Plan, this Disclosure Statement and Exhibits annexed hereto,

please indicate your vote(s) with respect to the Plan on the ballot sent to you and return it by the

deadline to Debtor's counsel. If you have a claim in more than one Voting Class, you are entitled

to vote for each Claim.

**PLEASE VOTE AND RETURN EVERY BALLOT THAT YOU RECEIVED. IN ORDER
TO BE COUNTED, BALLOTS MUST BE RECEIVED BY _____, 2023.**

**The Court will hold a hearing on confirmation of the Plan commencing _____
_____, 2023 (the "Confirmation Hearing").**

THE DEBTOR BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST
INTERESTS OF CREDITORS AND RECOMMEND THAT YOU VOTE TO ACCEPT THE
PLAN.

**DISCLAIMER: THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN
APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE
INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE
IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS**

**OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN.  ACCORDINGLY, PRIOR TO THE ENTRY OF AN ORDER GRANTING APPROVAL OF THE DISCLOSURE STATEMENT, THE FILING AND DISSEMINATION OF THE PLAN OF REORGANIZATION AND THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED ON FOR ANY PURPOSE.  THIS DISCLAIMER MAY BE REMOVED AFTER THE COURT GRANTS APPROVAL TO THE DISCLOSURE STATEMENT AND PRIOR TO DISSEMINATION TO THE CREDITORS.**

**NOBLE HEALTH REAL ESTATE II, LLC EXPRESSLY RESERVES ITS RIGHT TO AMEND THIS DISCLOSURE STATEMENT.**

## II.   INTRODUCTION AND OVERVIEW

### A.   PURPOSE OF DISCLOSURE STATEMENT

This Disclosure Statement (the "Disclosure Statement") has been prepared pursuant to section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*., by Noble Health Real Estate  LLC (the "Debtor") in connection with the Debtor's solicitation of votes for its *Plan of Reorganization* dated August 1, 2023 (the "Plan").  It contains important information about the Debtor and the Plan.  Unless defined in this Disclosure Statement, all capitalized terms shall have the meaning ascribed to them in Plan, unless the context indicates a different meaning.

In providing this Disclosure Statement to parties-in-interest, the Debtor expressly seeks to enable such parties to make an informed judgement on whether to approve or reject the Plan.

The Disclosure Statement contains a summary of the Plan, general information about the Debtor and its Chapter 11 Case, and important information concerning the Debtor's current financial condition and future prospects.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself, which has been filed

contemporaneously herewith.  Each creditor is encouraged to read, consider, and carefully analyze the terms and provisions of the Plan.

**B.**    **SOURCE OF INFORMATION**

The Disclosure Statement and the Plan have been prepared from information from the Debtor's partial historical books and records to which the current ownership has access.  The current ownership and management of the Debtor has only been involved with the Debtor since December 28, 2022, and has not had any direct contact with the prior owners or management of the Debtor, or a majority of the Debtor's historical books and records relating to, any time period when a hospital was operated at the real property owned by Debtor.  Neither the Debtor nor its professionals have conducted an independent investigation to verify such information.

Additionally, historic details regarding the operations of Debtor come from newspaper articles, discussions with former employees and various other sources, and represent Debtor's understanding, which may not be accurate.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified.  Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change of the facts set forth herein since the date of this Disclosure Statement.

**NO PERSON OR ENTITY HAS BEEN AUTHORIZED BY THE DEBTOR OR THE COURT TO GIVE ANY INSTRUCTIONS OR MAKE ANY REPRESENTATIONS CONCERNING THE DEBTOR OR ITS FINANCIAL AFFAIRS, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS, PROMISES, OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN, WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN**

**ARRIVING AT YOUR DECISION. SUCH REPRESENTATION, INDUCEMENTS AND/OR PROMISES, IF ANY, SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO, IN TURN, SHALL DELIVER SUCH INFORMATION FOR SUCH ACTION AS THE COURT MAY DEEM APPROPRIATE.**

### C.   OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and equity interest holders. In addition to permitting a rehabilitation and/or liquidation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of reorganization or liquidation is the principal objective in a Chapter 11 reorganization case. A plan of reorganization or liquidation sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization or liquidation by the Bankruptcy Court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization or liquidation has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtor is submitting this Disclosure Statement to Holders of Claims against, and equity Interests in, the Debtor to satisfy requirements of section 1125 of the Bankruptcy Code.

### III.    DESCRIPTION OF DEBTOR

#### A.    THE DEBTOR-IN-POSSESSION

On February 10, 2023 (the "Petition Date"), the Debtor filed a Voluntary Petition under Chapter 11 of Title 11 of the United States Code, §§101 *et. seq.* in the United States Bankruptcy Court for the Western District of Missouri commencing its Chapter 11 Case.  The Chapter 11 Case was assigned to the Honorable Dennis R Dow.  Upon filing the Chapter 11 Case, the Debtor became the "debtor-in-possession," as that term is understood in the Bankruptcy Code.

#### B.    DEBTOR'S PRINCIPAL AND MANAGEMENT

##### 1.    **Background:**

Debtor is owned through a series of entities.  The three individuals that ultimately own Debtor are:

Kalman Groner.  Mr. Groner is the founder and CEO of a software company, with a talent for identifying growth opportunities and a track record of driving tech-fueled success at healthcare, manufacturing, and insurance.

Gary Greenstein.  Mr. Greenstein is a corporate attorney and team builder with experience on Wall Street and who serves as an advisor, board member, and investor at several healthcare and technology startups.

Zevi Reisman.  Mr. Reisman is a skilled fundraiser and investment syndicator with experience managing donor relationships at several non-profits and a knack for discovering new ways to enrich communities.

2.    **Compensation**:

Since the Petition Date, no payments have been to any person or entity for the management of Debtor.  Debtor does not anticipate paying any person or entity for the management of Debtor after the Effective Date of the Plan.

3.    **Legal Relationship Between Principals and Debtor**:

Debtor is owned by Noble Health Corp., which is currently owned by Pasture Medical LLC, a Wyoming limited liability company, which is ultimately owned by Kalman Groner, Gary Greenstein and Zevi Reisman.

Ziva Medical Fulton LLC ("Ziva") is an affiliate of Debtor which is owned by ultimately by Kalman Groner, Gary Greenstein and Zevi Reisman.  The Chief Executive Officer of Ziva is Amanda Shurtz ("Shurtz").

Shurtz is a Registered Nurse who started her career caring for patients in rural Illinois and serving in nurse leadership roles at the U.S. Department of Veteran Affairs and other care organizations.

Shurtz found her true calling in healthcare leadership, serving as Regional CEO opening

four micro-hospitals in Wisconsin and Tennessee, CEO at rural Illinois' Crossroads Community

Hospital and CEO at Clay County Critical Access Hospital.

Shurtz is compensated by Ziva with a salary of $29,166.67 per month.  Shurtz is not

compensated by Debtor and will not be compensated by Debtor after the Effective Date.

4.       **Future Principals of the Debtor and Compensation**:

After the Effective Date of the Plan, Debtor anticipates that it will still be owned by Noble

Health Corp.  However, the ultimate owners of Noble Health Corp. may change to the extent

necessary to obtain additional investors who require equity in exchange for their investments.

5.       **Post Confirmation Operations**

Debtor is the owner of real property located primarily in Fulton County Missouri (the "Real

Property"); a complete list of the Real Property is attached as **Exhibit B**).  The property listed on

Exhibit B that is located in Mexico Missouri was previously used as part of a hospital complex.

The remaining property outside of Mexico Missouri was used for various clinics, rehabilitation

centers and other medical related uses.

On the Effective Date, Debtor as master landlord will enter into a master lease of the Real

Property with Blessed Health LLC ("Blessed Health") as the master tenant.  Blessed Health is an

affiliate of Debtor because Blessed Health is ultimately owned by Kalman Groner, Gary

Greenstein and Zevi Reisman.  Blessed Health will pay monthly rent to the Debtor of $68,000,

which Debtor believes will be sufficient to pay all of the obligations due under the Plan as well as

pay all other ongoing expenses of Debtor, including insurance, taxes and maintenance.

Blessed Heath will have sufficient funds to pay the monthly rent based on subleases entered into by Blessed Health, with (i) a rural emergency hospital in Fulton, MO owned and operated by an affiliate of Blessed Health, (ii) various partnerships between third-party medical and service providers and an affiliate of Blessed Health, and (iii) third-party medical and service providers.

It is not anticipated that all of the sub-tenants will be established and paying rent as of the Effective Date. However, Letters of Intent for Ziva Behavioral Health, Ziva Wellness & Rehab Center, Ziva Laboratory Services, Ziva Recovery Center (Substance Abuse Treatment), and Ziva Wound Care have already been executed; and negotiations continue for Ziva Long Term Care & Assisted Living, and Ziva Pharmacy, To the extent that initially Blessed Health is not receiving sufficient rental income to pay the rent owed on the lease with Debtor, Blessed Health's principals anticipate advancing sufficient funds to make these payments.

For a more thorough discussion of Debtor, its plans for the sub-tenants after the Effective Date, and related post-confirmation operations, see the PowerPoint attached as **Exhibit G**.

C.    DESCRIPTION OF DEBTOR'S BUSINESS AND CAUSES FOR CHAPTER 11 FILING

Debtor is a company that owns the Real Property located in Fulton County, Missouri, as listed on Exhibit B. The primary property located in Mexico Missouri was previously a hospital operated by an affiliate of Debtor, and the remaining properties were medical clinics and other health care facilities.

Well before the Petition-Date and well before the acquisition of Debtor by current owners, the hospital struggled. In or around March of 2021, SSM Audrain sold the hospital and the Debtor's real estate property and related entities to an entity named Noble Health[1]. After that

---

[1] Noble Health has no affiliation with Debtor's current ownership or management.

transaction closed, the hospital was operating under the name Noble Health Calloway Community Hospital.

Around the time of the Noble purchase, local news reported an "air of optimism" surrounding Noble's hospital purchase. However, over the year following, it became clear that Noble was struggling.  On March 18, 2022, Noble announced via social media it was limiting services at the Fulton Community hospital because of an "IT issue."  Then, just six days later on March 24, 2022, Noble stopped seeing patients, halted all hospital medical service-related operations, and explained the need to "restructure [its] process and become financially viable."

On or about, April 20, 2022, Noble sold all outstanding capital stock of Noble Health Corp. and Noble Health Services, Inc. to Platinum Neighbors, Inc[2]. for $2.00, plus the assumption of all liabilities and obligations, including the obligation to indemnify Noble against all lawsuits (the "Obligations").  Platinum assumed control of hospitals and nine clinics and told the community it would eventually reopen them.  Unfortunately, Platinum did not live up to this commitment and on or about September 9, 2022, Platinum shut down all of the hospital's remaining operations and sent employees a termination notice.

On or about December 7, 2022, Platinum sold the hospital to Saint Pio of Pietrelcina LLC ("SPOP")[3] and SPOP assumed the Obligations.  Just three weeks later on December 28, 2022, SPOP sold the hospitals to Pasture Medical LLC ("Pasture") but Pasture specifically did not take on the Obligations.

At the time of the Pasture transaction, Pasture was led to believe that the hospital continued to maintain a valid license to operate.  However, soon after the Pasture transaction closed, Missouri

---

[2] Platinum Neighbors Inc. has no affiliation with Debtor's current ownership or management.

[3] SPOP has no affiliation with Debtor's current ownership or management.

licensing authorities, in response to a change of ownership request, notified Pasture that the hospital had already lost its license.  It also became apparent that expensive medical equipment and critical building systems had not been fully maintained for years.  This was in addition to the significant number of unpaid bills left behind by the former owners related to taxes, utilities, employee salaries, employee health insurance, and vendor payments.  Also, the hospital was also hit with dozens of new lawsuits and default judgments relating to Noble's and Platinum's unmet obligations.

It soon became clear to Pasture that it had not purchased what it expected.  Pasture thought it was purchasing a turnkey operation.  Pasture thought that some equity investment would be necessary for working capital, but that the hospital was otherwise ready to operate.  Instead, Pasture found itself the owner of a hospital that would require significant capital improvements, before it would even get to the stage where operating capital could be invested and the facilities reopened.

At that time, Pasture had a choice.  It could simply walk away and never reopen the hospitals, like Noble, Platinum and SPOP had done, or it could figure out what it would actually take in terms of effort and investment to reopen the hospital and other medical clinics.  Pasture hired Shurtz to help with this assessment.

Shurtz determined that, while it would not be easy or cheap, the medical facilities could be reopened, so long as going forward they did not make the same mistakes as they had in the past.  Shurtz completed a careful analysis of the operating history of the hospitals. She concluded that the prior hospital owners were trying to be all things to all people without a clear strategy. In addition, she applied her detailed understanding of recent rural healthcare failures throughout the country.

Based on Shurtz's recommendations, Ziva will restructure the hospital's operations to meet the communities' urgent and ongoing healthcare needs in a sustainable fashion.

Shurtz's new right-sized model of care includes six key pillars:

1. Meet the communities' critical healthcare needs.

2. Focus on services for which there is essential patient demand.

3. Carefully manage the hospitals' revenue cycle to ensure hospital sustainability.

4. Fine-tune costs and expenses. For instance, Ziva expects the go-forward cost of running its operations to be significantly less than Noble's historical costs.

5. Leverage the benefits of partnering with experienced and specialized healthcare service providers.

6. Utilize cutting-edge healthcare technology, such as, telemedicine and remote patient monitoring, where possible to improve patient care and outcomes.

### IV.   POST-PETITION EVENTS OF SIGNIFICANCE

There have not been any post-petition events of significance.

### V.   SUMMARY OF PLAN

The Plan provides for the satisfaction of all Allowed Administrative Claims on the Effective Date or as soon thereafter as practicable, unless otherwise agreed by the Holder of such Claim.  As to each Administrative Claim Allowed thereafter, payment will be made as soon as practicable.

The Plan also provides for the satisfaction of all Priority Claims in accordance with section 1129(a)(9) of the Bankruptcy Code by either payment on the Effective Date or payment over a five-year period in installments.

There are three (3) classes of Creditors and Interest Holders.  Each of the Class is Impaired and entitled to vote.  The treatment for each Class is summarized below.

A.    **CLASS I CONSISTS OF THE SECURED AND UNSECURED CLAIM OF LEAD BANK**

Lead Bank's Secured Claim shall be $1,360,000 and shall be amortized over 30 years at the contractual interest rate of 5.5%, with a monthly payment of $7,722.  The outstanding balance of Lead Bank's Secured Claim shall be paid in full by October 1, 2030.

For the Unsecured Claims, Lead Bank shall receive quarterly payments of $2,083 beginning January 1, 2024 and continuing for 12 consecutive quarters.

B.    **CLASS II – ALLOWED CLAIMS OF**

      **UNSECURED CREDITORS**.

Unsecured Creditors shall receive their pro rata share of shall of quarterly payments of $2,083 beginning January 1, 2024, and continuing for 12 consecutive quarters.

C.    **CLASS III – EQUITY INTERESTS**

The Holders of Allowed Interests shall retain their Allowed Interests in the Reorganized Debtor in the same percentages as held prior to the Petition Date in exchange for guarantying the Professional Fees.

## VI.    ASSETS AND LIABILITIES

A.    **LIQUIDATION ANALYSIS**

The Debtor's Liquidation Analysis is attached as **Exhibit C**.

If the Plan is not accepted by the Creditors or is not otherwise confirmed by the Bankruptcy Court, the Debtor believes that the Debtor's assets would be liquidated in a straight bankruptcy liquidation under Chapter 7 of the Bankruptcy Code.    As a result, and assuming the validity and amount of Lead Bank's Claim, the Debtor anticipates that no money would be available to pay any

amount to Unsecured Claims in a straight bankruptcy liquidation under Chapter 7 of the Bankruptcy Code.

### B. RISKS, CONDITIONS AND ASSUMPTIONS IN LIQUIDATION ANALYSIS

The Debtor has estimated the forced liquidation value to determine the value of the Debtor's assets. Except as provided in the Liquidation Analysis, the risks, conditions, and assumptions are estimations by the Debtor, in consultation with its professionals, based upon their collective experience in the market.

### C. CAUSES OF ACTION

As Debtor's current ownership and management does not have complete knowledge of Debtor's operations prior to December 28, 2022, Debtor is unaware of any causes of action it may have the right to bring. However, the lack of knowledge regarding causes of action should not be taken as a representation by Debtor that no such causes of action exist, or that any such causes of action are waived. In voting on the plan, Debtor encourages all parties to consider that the Debtor may have the right to bring unidentified causes of action, including claims against the creditor voting.

### D. SECURED CLAIMS

Lead Bank has asserted a Secured Claim against the Debtor's Real Property, subject only to the real property taxes. Based on the appraisal obtained by Debtor, the Real Property is worth approximately $1,260,000. There are no outstanding real property taxes leaving Lead Bank with a secured claim of $1,260,000.

### E.    PRIORITY CLAIMS AND ADMINISTRATIVE EXPENSE CLAIMS

Debtor does not believe that there are any priority tax Claims, other than potential real property taxes.  However, to the extent that there are any Claims for prior taxes, then such Claim, when Allowed, shall receive the treatment ascribed to Priority Creditors in Group III of the Plan. *See* Plan, § 2.2.  Fulton County has not asserted real property taxes.  To the extent such taxes are due, they shall receive the treatment ascribed to Priority Creditors in Group III of the Plan.  *See* Plan, § 2.2.   All rights and objections with respect to any Priority Claims including, without limitation, to challenge the assessed value of the Real Property are specifically reserved for the Debtor and Reorganized Debtor.

Assuming an October 2023 confirmation date, the Debtor estimates administrative professional fees in the amounts of, (i) Berman, DeLeve, Kuchan & Chapman, LLC fees and costs, estimated at $40,000; and (ii)  CFGI fees and costs estimated at $75,000;

The Debtor also anticipates that fees arising under 28 U.S.C. § 1930 owing to the Office of the United States Trustee will be due and owing and such fees will be an Administrative Expense.

### F.    NON-PRIORITY UNSECURED CLAIMS

Debtor estimates that the total Non-Priority unsecured claims, including the under secured potion of Lead Bank's claim as well as the unsecured junior judgment lien holders on the Real Property total approximately $6.0 Million including claims that the Debtor intends to dispute.

## VII.    IMPLEMENTATION OF PLAN

**A.**    The Debtor intends the Debtor to continue in business by reorganizing its operations and debt structure.  Debtor intends to enter into a master lease with Blessed Health LLC

("<u>Blesses Health</u>"), an affiliate of Debtor.  The lease will provide payments from Blessed Health

that are sufficient to make all of the payments due under the Plan and to pay all other costs

associated with the Real Estate, including taxes, insurance and maintenance.

B.    **F**INANCIAL **I**NFORMATION

1.    **Pre-Petition Financial Summaries:**    The current management and

employees of the Debtor were not associated with Debtor when the previous hospital and other

medical clinics were operating on the Real Property owned by Debtor.   Accordingly, Debtor

currently possesses no knowledge of the financial condition of the Debtor.   Current management

was able to locate some financial information on the computer system remaining in the Real Estate.

Attached as **Exhibit D** is that financial information.   Current management does not know the

accuracy of the information and what portion of the information relates to the Debtor's operations

and what portion relates to related entities' operations.   Current management does not believe that

the prior financial information has any bearing on the future performance of the Debtor for the

reason that the medical facilities operated on the Real Property owned by Debtor will be

substantially different that the medical facilities previously operated on the Real Property.

2.    **Post-Petition Financial Summaries:**  The Debtor has attached as **Exhibit**

**E**, the Debtor's monthly operating reports during this Chapter 11 proceeding, which reflects the

Debtor's financial performance during this chapter 11 proceeding.

Furthermore, the Debtor has attached as **Exhibit E**, its summary of post-confirmation

financial projections for the life of the Plan, which demonstrate the Debtor's ability to make the

payments required under the Plan.   The Debtor anticipates, but cannot guarantee, that actual

performance will be in-line with the projections.   Events outside of the control of the Debtor could

prove the projections in error.

### C.     TAX RAMIFICATIONS

1.     **To Debtor:**  The Debtor believes that the forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in a significant tax consequence to the Debtor.  The forgiveness of indebtedness, pursuant to the Internal Revenue Code, can be applied either to the Debtor's basis in its respective assets or to its net operating loss carry forward.  The Debtor cannot accurately determine the amount and extent of any forgiveness of indebtedness.  First, the Debtor must determine if all of the Claims that have been filed, or deemed filed within this Case, are accurate.  Also, depending on whether the Debtor's current fiscal year results, the Reorganized Debtor may elect to apply any forgiveness of a debt in this directly to its basis.  Despite the fact that the Debtor believes that the Debtor can either (a) apply such forgiveness of indebtedness to its net operating loss carry forward or (b) to its basis, it is not expected that the amount of forgiveness of debt will be totally offset by the foregoing.  However, once these net operating losses are used by the Debtor to offset forgiveness of indebtedness, they cannot be used again.

2.     **To Creditors:**  The tax consequences to each Creditor resulting from confirmation of the Plan may vary depending upon each Creditor's particular circumstances.  The Debtor recommends that Creditors or Holders of Claims obtain independent tax counsel to advise them as to the tax consequences of the Plan.

# VIII.    LEGAL REQUIREMENTS

## A.    VOTING PROCEDURES

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of Claims, or equity Interests, that are impaired under the Plan.  Accordingly, classes of Claims or Interests that are not impaired are <u>not</u> entitled to vote on the Plan.

Creditors that hold Claims in more than one impaired class are entitled to vote separately in each class.  Such a Creditor will receive a separate ballot for all of its Claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately.  A Creditor who asserts a Claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to Claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent, or unliquidated; or (b) for which a Proof of Claim was filed on or before the Bar Date set by the Court for the filing of Proofs of Claim (except for certain Claims expressly excluded from that Bar Date or which are allowed by Court order).  However, any vote by a Holder of a Claim will not be counted if such Claim has been Disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such Claim for voting purposes pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

Voting on the Plan by each Holder of a Claim or Interest in an impaired class is important.  After carefully reviewing the Plan and Disclosure Statement, each Holder of such a Claim or Interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Court by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

### B.    ACCEPTANCE

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots.  The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots.  If no Creditor or Interest Holder in an impaired class vote, then that class has not accepted the Plan.

### C.    CONFIRMATION

Section 1129(a) of the Bankruptcy Code establishes conditions for the confirmation of a plan.  These conditions are too numerous and detailed to be fully explained here.  Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under section 1129(a) of the Bankruptcy Code are these:  1) Each class of impaired creditors and interest must accept the plan, as described in VI. B above or, 2) Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

### D.    MODIFICATION

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

### E.    EFFECT OF CONFIRMATION

If the Plan is confirmed by the Court:

1.    Its terms are binding on the Debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the Plan.

2.    Except as provided in the plan:

a.    In the case of a corporation that is reorganizing and continuing business:

i.    All Claims and Interests will be discharged.

ii.    Creditors and equity interest holders will be prohibited from asserting their Claims against or Interests in the Debtor or its assets.

## DISCLAIMER

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT BY REFERENCE. ALL UNDEFINED CAPITALIZED TERMS HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY OTHER SECURITIES REGULATORY AUTHORITY, NOR HAS THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY OTHER GOVERNMENTAL AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE

PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY, OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY-IN-INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL, OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING, STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTOR, ITS ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE DEBTOR WILL NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR

REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW

INFORMATION, FUTURE EVENTS, OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS, FINANCIAL CONDITIONS, OR THE VALUE OF ITS PROPERTY ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS AND REPRESENTATIONS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO CREDITORS TO SECURE AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.

THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, SHOULD BE READ IN ITS ENTIRETY. ADDITIONALLY, IT MAY BE ADVISABLE FOR CREDITORS TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.

## CONCLUSION

The Debtor submits that the Plan provides for an orderly and relatively expeditious payment of most of Debtor's indebtedness to Creditors under conditions that will enable the Debtor to continue operating. The Debtor further submits that the alternative of a Chapter 7 liquidation does not appear to be a viable method of maximizing recovery to creditors in this Case, in that the added expense of administering a Chapter 7 and the fire-sale nature of Chapter 7 would decrease and eliminate the amount that general Unsecured Creditors would receive in a Chapter 7 setting. The Debtor's estimated value of the Debtor's assets represents a fair market value in an arms-length transaction in normal conditions, which is far higher than what can be achieved under Chapter 7 of the Bankruptcy Code.

In the opinion of the Debtor, the Plan is the best available option for Creditors because it will provide the greatest and quickest distributions to Creditors.

**DATED: August 01, 2023**

**Respectfully submitted,**
**Noble Health Real Estate LLC**

By: **/s/ *Zev M. Reisman***_____
Zev M. Reisman
General Manager and Corporate Secretary

**Respectfully submitted,**
**BERMAN, DeLEVE, KUCHAN & CHAPMAN, LLC**

By: **/s/ *Ronald S. Weiss***_____
Ronald S. Weiss, MO #21215
Joel Pelofsky, MO #17929
1100 Main Street, Suite 2850
Kansas City, Missouri 64105
T: (816) 471-5900 / F: (816) 842-9955
rweiss@bdkc.com
jpelofsky@bdkc.com
**ATTORNEY FOR DEBTOR and**
**DEBTOR-IN-POSSESSION**

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that the foregoing Motion was filed electronically with the Clerk of the Bankruptcy Court on the 1st day of August 2023 and was served electronically on those parties receiving electronic notice through the Court's CM/ECF system.

**/s/ *Ronald S. Weiss***_____
Ronald S. Weiss, MO #21215
**ATTORNEY FOR DEBTOR and**
**DEBTOR-IN-POSSESSION**